## International Packing Co. v. John Cichowicz.

1. PLEADING—*Where a Specific Act of Negligence is Charged, it Must Be Proved.*—If a specific act of negligence is charged, it is incumbent on the plaintiff to prove the act.

2. SAME—*Recovery May Be Had on Common Law Grounds of Negligence if Evidence to Prove Statutory Grounds Fails.*—Where an ordinance quoted in a count of the declaration is not introduced in evidence, the count may still be sufficient to support a recovery upon the common law grounds of negligence.

3. MASTER AND SERVANT—*Servant Assumes All Usual Known Dangers.*—As between employer and employe, the latter assumes all the usual known dangers incident to the employment.

4. SAME—*Servant Voluntarily Continuing in Employment with Knowledge of Defective Appliances.*—A servant who, with full opportunity of knowledge, works for any considerable length of time in a building, or upon premises where there are dangerous defects, and does not make complaint and ask for the repairs or improvement necessary for safety, is held to have assumed the risks involved.

Trespass on the Case, for personal injuries. Error to the Superior Court of Cook County; the Hon. THEODORE BRENTANO, Judge presiding. Heard in this court at the October term, 1902. Reversed. Opinion filed March 19, 1903.

AMERICUS B. MELVILLE and F. J. CANTY, attorneys for plaintiff in error.

D. K. TONE and H. M. ASHTON, attorneys for defendant in error.

MR. JUSTICE ADAMS delivered the opinion of the court.

Defendant in error, plaintiff below, recovered judgment against plaintiff in error, defendant below, for the sum of $2,650, to reverse which the writ of error in this case was sued out. The action was case, for injury to the person, alleged to have been caused by the negligence of the defendant. The original declaration was withdrawn by the plaintiff, and the court instructed the jury to disregard the second and third additional counts, filed September 28, 1901, so that the only counts left were the first additional count, filed September 28, 1901, and the first, second and third additional counts, filed October 1, 1901. These counts will be referred to as counts 1, 2, 3 and 4, respectively.

Count 1 avers, in substance, that, to wit, February 28, 1900, the defendant was the owner of and was operating a certain packing house in the city of Chicago; that plaintiff was in defendant's employ in the handling of refuse matter in the fertilizing department of said packing house; that defendant had constructed at the east end of the room in which plaintiff was employed a catch-basin about four feet square and four feet deep, which was covered with movable lids or covers, except at all times when defendant's employes were ordered by defendant to open and skim the catch-basin, and that, immediately after such catch-basin was skimmed, said lids were, by said defendant, placed over said catch-basin, completely covering the same; that said skimming occupied only a few minutes; that the space where said catch-basin was situated was used by defendant as a passageway, where plaintiff and other servants of defendant constantly walked when going to the places where they performed their work, and the covering of the basin formed a part of the permanent floor of the room; that defendant permitted to accumulate in said catch-basin

large quantities of hot water, grease and other materials; that the room in which plaintiff was working was filled with steam and mist, and by reason thereof it was dark, and it was almost impossible to see the floor, and it was defendant's duty to keep the catch-basin constantly covered, except when being skimmed; that "defendant negligently and carelessly removed the lids or coverings from said catch-basin, and permitted the said catch-basin to be and remain uncovered for a long space of time, to wit, many hours, and that, on the morning of the said 28th day of February, 1900, at about the hour of seven o'clock, the said plaintiff was then and there passing over the space in said floor, where said catch-basin was situated, for the purpose of going to his place of work in said fertilizing department, and, while so doing, and in the exercise of ordinary care for his own safety, the plaintiff then and there unavoidably stepped into the hole or opening in said catch-basin, so negligently left open by said defendant in the manner above described, and then and there fell into said mass of hot grease, water and other materials," by reason whereof the plaintiff was greatly burned, scalded and wounded, etc.

Count 2 is substantially the same as the foregoing, except it is averred therein that on the two outer edges of the catch-basin were placed two certain lids or covers, covering about two-thirds of the basin, and that in the center between said lids, there was an open space about eighteen inches wide; that said lids were kept in place at all times except when the basin was being skimmed, when they were removed, and as soon as the skimming was completed, the lids were put in their places. The negligence averred in this count is, that the defendant "negligently and carelessly removed one of said lids or coverings from said catch-basin, and then and there negligently and carelessly permitted one of said lids to be removed from said catch-basin, and that portion of said catch-basin, ordinarily covered by said lid, to be and remain open and uncovered for many hours, when said basin was not being skimmed." It is then averred that the plaintiff, while going to work, " unavoid-

ably stepped into the hole or opening in said catch-basin, so negligently left open by said defendant, in the manner above described," etc.

Count 3 differs from the last only in the following particulars: It is averred that one of the lids of the catch-basin had, in some manner, been removed, and that the part of the basin ordinarily covered by the removed lid remained uncovered until the plaintiff fell into the basin; that it was the duty of the defendant to exercise reasonable care in inspecting the premises where plaintiff was working, before plaintiff's duty commenced, on the morning of February 28, 1900, for the purpose of seeing that the premises were in a reasonably safe condition, and that the basin was properly covered; that the defendant failed so to do, etc., and that the plaintiff " unavoidably stepped into the hole or opening in said catch-basin, so negligently left open by said defendant, in the manner above described," etc.

In count 4 it is averred that the lids of the catch-basin were movable, and were, from time to time, removed by the defendant's servants; that the basin as located, was highly dangerous to the lives and limbs of defendant's servants, and that it was practicable to so guard and cover the same that the lives and limbs of defendant's servants would not be endangered, and that there was then in force an ordinance of the city of Chicago as follows :

" In every factory, workshop, or other place where machinery is employed, the belting, shafting, gearing, elevators, and every other thing, when so located as to endanger the lives and limbs of those employed therein, while in the discharge of their duties, shall be, as far as practicable, so covered and guarded as to insure against injury to such employes."

It is then averred that the defendant " negligently, willfully and wantonly, contrary to its duty, and in violation of said ordinance, operated said factory, and used said catch-basin, in the manner above described, and permitted the same to remain unguarded, in the manner above described, without covering or guarding the same, so as to insure

against injury to said employes," etc., and that the plaintiff "unavoidably stepped into said basin and fell into the same," etc.

In this count, as in count 2, it is averred that there were two lids or covers on the catch-basin, covering about two-thirds of it, and that there was a space about eighteen inches wide between the lids.

The room in which the plaintiff worked was lighted by windows and electric lights. It was about 150 feet in length from east to west and about fifty feet in width from north to south, and was called the tanking department, which includes the fertilizing department. On the south side of the building and next to the south wall there was a row of vats, and about ten feet north of the row of vats and parallel therewith there was a row of six presses, three of the presses being on one side of an alley running north and south, and three on the other side. This north and south alley, or space between the presses, was a passageway, through which one could pass to or from the ten feet space between the presses and vats. There were two doors in the north wall, one about one-quarter the length of the room from the west wall, and the other about the center of the length of the wall. When the men came to work they came into the room through the west door in the north wall. The catch-basin where the accident occurred was at the east end of the building, and there was a space of about fourteen inches between the west edge of the catch-basin and the east side of the press nearest the basin. There was a space of about six feet between the east wall and the most easterly press.

The plaintiff testified that the catch-basin was four by five feet in dimensions, and that it was partially covered by boards or lids, one on the south side and one on the north side of the basin; that he did not measure the boards, but they were about twelve inches wide. Between these lids there was an open space. The lids of the catch-basin, when in place, rested on two by four cleats nailed to the floor joists, and were on the same level as the floor. A

witness, who was foreman of the tank room at the time of the accident, describes the plaintiff's employment thus :

" Cichowicz was working there when I went there. That was about nine years ago. To my knowledge he had been working there six years when he was hurt. During that time he had been working right around where the accident happened in the pressroom. We used him as a kind of general man, such as skimming the catch-basins, building presses, shoveling vats and shoveling lard, anything that we had for him to do in that business. He would have to throw out of the vats in the morning or receive it from the tanks onto the floor, turn the water off before they started to work, so that they could go to work before seven o'clock. The water was first drawn off; always done in the same way. There was a plug in the end of the vat and a screen around it. We would raise that plug out and let the water run down through into the vat below. That was let out before the tankage went down to the vat where he shoveled. It was boiled upstairs. The water was let out and then the tankage went down the chutes into the vat. That water ran along the inside wall through the pressroom. We dumped that out to make tankage out of it. The water was let out every morning before the tankage was let out. Always the same way. This hot water would go through the basin into which he fell. "

Plaintiff, himself, testified as follows :

Q. " How long had you been working in that room before the morning of the accident?" A. "I worked there six or seven years. I have always had that same job at that same work. I would throw the stuff out of the vats into the presses, getting it ready to squeeze out with screws. Then the hot water would run out of the presses into the catch-basin. And when I would shovel the stuff into the presses I would go into the ten-foot alley between the vats and the presses. I skimmed out the catch-basin. During the six years I worked there I went across this catch-basin several times a day. I had been going over that catch-basin five or six times a day for six or seven years. Not only myself, but everybody else. When the men were coming in the morning everybody would undress and redress and go to work. My place was down toward the east on the east end of the room. I went to get the stuff ready for them. The man that was on the east of the room was the one who usually skimmed the catch-basin. When I skimmed I skimmed with a skimmer."

He further testified that before skimming the grease off the surface of the water, he took the lids off, and after skimming replaced them. One of plaintiff's witnesses testified that plaintiff during the time the witness worked for defendant, skimmed the catch-basin mostly. It appears from the evidence that it was plaintiff's duty to let the water out of the vats in the morning, and the water, when let out, would flow into a catch-basin west of the one where the accident occurred, and from that catch-basin, by means of a sewer or drain, to the catch-basin where the accident occurred. One of plaintiff's witnesses testified that there was an alleyway between the presses through which one could go into the space between the presses and the vats. Another of plaintiff's witnesses testified that there were two ways to go into the space between the presses and the vats, one through the alley already mentioned, and the other at the west end of the room.

No one witnessed the accident except the plaintiff. He testified, in substance, that he was going to the presses to put the stuff out of them, and that there was a good deal of steam, and he could not see very well, but that he could see that the catch-basin was covered, and that he wanted to step over the center onto the board farther to the south, and the board tilted and he fell in with it. Being asked, "What was the condition of the light?" he answered, "There were electric lights there." John McKlowski, a witness for plaintiff, and in defendant's employ at the time of the accident, testified that he came to the room about 6:30 o'clock in the morning, and then first saw the plaintiff; that he and plaintiff were standing on the floor waiting for the whistle to blow, and plaintiff said: "I guess I will go and get the stuff ready for you boys, so you can start to work when the whistle blows;" and plaintiff then walked off, and in about half a minute the whistle blew, and he heard plaintiff hallooing, and he and another man ran over and picked him up, and saw that one of the boards that covered the basin was turned into the water. This witness further testified:

" There was no steam in the room that morning from the time I was there, at half past six in the morning, until about five minutes before the whistle blew. The steam rose right out of that catch-basin, and it wasn't very dark; because if a man got down, bent down, he could see pretty near everything down below, under the steam. The steam was blowed about two and a half feet off the floor."

The evidence of other witnesses in regard to the steam is, in substance, that in cold weather steam would rise considerably from the hot water, and in warmer weather not so much, and that on the day of the accident there was no more steam in the room than was usual in the kind of weather then prevailing. It is a familiar rule that if a specific act of negligence is charged, it is incumbent on the plaintiff to prove the act. T. W. & W. Ry. Co. v. Foss, 88 Ill. 551; Gavin v. City of Chicago, 97 Ib. 66; Wabash W. Ry. Co. v. Friedman, 146 Ib. 583.

There is not only no evidence to sustain the act of negligence averred in count 1, viz., that the defendant removed both lids of the catch-basin, nor the act of negligence averred in count 2, viz., that the defendant removed one of the lids. On the contrary these averments are directly contradicted by the plaintiff, who testified that, at the time of the accident, the catch-basin was covered.

The negligence averred in count 3 is failure of the defendant to inspect the catch-basin and its lids. The law in respect to' the duty of an employer to inspect at reasonable intervals does not apply to a case like the present. The condition of the catch-basin and its lids was apparent to the most casual observation, and was as well, if not better, known to the plaintiff than to the defendant. An inspection, immediately before the accident, would have discovered merely what the plaintiff testified he knew, viz.: that the catch-basin was covered. Defendant's counsel say, in their argument, that one George Gregory was the night foreman; that he was in charge of the room the night before the accident, and that it was his duty to see that everything was in proper place.

Counsel do not object that the abstract is insufficient.

The abstract contains no evidence to sustain the statement of counsel, nor do they refer us to any page of the record containing such evidence. Therefore we are compelled to ignore the statement.

The ordinance quoted in count 4 was not introduced in evidence, but we are inclined to the view that, excluding the references to the ordinance, the count may be regarded as sufficient in charging as negligence failure to guard, or otherwise protect the catch-basin. R. R. I. & St. L. R. R. Co. v. Phillips, 66 Ill. 548; Chicago, W. Div. Ry. Co. v. Ingraham, 131 Ib. 659.

Counsel for defendant contend that the plaintiff assumed the risk, if any, of the condition of the catch-basin, and this contention must be sustained for the reasons: First. Plaintiff had been in the employ of the defendant nearly seven years at the time of the accident, and there is no evidence that the condition of the catch-basin and its lids were not the same at the time of the accident as when plaintiff was employed. It is a legitimate inference from this that the condition was the same during all the time of plaintiff's employment; because if during that time any change was made favorable to the plaintiff's claim, it would almost certainly have appeared from the evidence. Second. The plaintiff was thoroughly familiar with the condition of the catch-basin and its lids. His testimony is: " I worked there six or seven years. I have always had the same job." Part of the job referred to was skimming the basin, to do which plaintiff removed the lids, and, when he had finished skimming, replaced them. He testified that for six or seven years he had passed over the catch-basin five or six times a day. Third. During all the time he was employed, he made no complaint or suggestion that the catch-basin was in an unsafe condition, but continued his work as usual, being, as before stated, thoroughly familiar with the condition of the basin. Fourth. He was never ordered or directed to walk over the catch-basin. Fifth. It was not necessary to pass over the catch-basin to go to his place of work. There were three other ways, safe and apparently

more convenient. There was a space, as he testified, of fourteen inches between the west side of the catch-basin and the east side of the press nearest to the catch-basin. No reason is perceived why he could not have passed over this space. He might have passed through the north and south alley between the presses, which, probably, was left open for that purpose, into the ten-foot space between the rows of vats and presses, and east to the catch-basin, or he might have passed into the open space between the vats and presses between the west wall of the room and the presses. It was certainly both safe and convenient to pass by the west wall, or by the north and south alley, into the space between the rows of vats and presses, where his work was, and along which he might have walked east to the catch-basin. But, for some reason not apparent, he deliberately and voluntarily chose to walk over the catch-basin.

In Herdman-Harrison Milling Co. v. Spehr, 145 Ill. 329, 333, the court say:

" That as between employer and employe, the latter assumes all the usual known dangers incident to the employment, and that he also takes upon himself the hazard of the use of defective tools and machinery, if, after his employment, he knows of the defect, but voluntarily continues in the employment without objection, are familiar rules of law, often recognized by the decisions of this and other courts."

In Armour v. Brazeau, 191 Ill. 117, 127, the court say:

" If a defect in an appliance is open and obvious, so that, by the exercise of ordinary care in the use of the appliance, the employe will have knowledge of the defect, he is bound to take notice of the defect. He can not assume a fact against his own knowledge, and assume that a defect open to his observation does not exist."

In Howe v. Medaris, 183 Ill. 288, 290, the court say:

" In the case of Goldie v. Werner, 151 Ill. 551, we said (p. 556) : ' The rule of law in respect to the burden of proof that is imposed upon a servant in a suit against his master for injuries resulting from defective machinery, etc., is stated in section 414 of Wood on Law of Master and Serv-

ant: " The servant, in order to recover for defects in the appliances of the business, is called upon to establish three propositions: First, that the appliance was defective; second, that the master had notice thereof, or knowledge, or ought to have had; third, that the servant did not know of the defect, and had not equal means of knowing with the master." The rule was there approved and followed, and is the well settled law of this state.' "

In Bailey's Master's Liability, etc., p. 145, the author states the rule thus:

" Therefore it has come to be well settled that the master may conduct his business in his own way, although another method might be less hazardous; and the servant takes the risk of the more hazardous method, as well, if he knows the danger attending the business in the manner in which it is carried on. Hence, if the servant, knowing the hazards of his employment as the business is conducted, is injured while employed in such business, he can not maintain an action against the employer because he may be able to show there was a safer mode in which the business might have been carried on, and that, had it been conducted in that manner, he would not have been injured."

In 2 Thompson on Negligence, p. 1008, section 15, the following occurs:

" If the servant, before he enters the service, knows, or if he afterward discovers, or if, by the exercise of ordinary observation or reasonable skill and diligence in his department of service, he may discover, that the building, premises, machine, appliance, or fellow-servant in connection with which or with whom he is to labor, is unsafe or unfit in any particular, and if, notwithstanding such knowledge, or means of knowledge, he voluntarily enters into or continues in the employment without objection or complaint, he is deemed to assume the risk of the danger thus known or discoverable, and to waive any claim for damages against the master in case it shall result in injury to him," etc., citing numerous cases.

In 1 Shearman & Redfield on the Law of Negligence, 4th Ed., p. 361-2, section 209, the authors say:

" One who, with full opportunity of knowledge, works for any considerable length of time in a building, or upon premises where there are dangerous defects, and does not make complaint, and ask for the repairs or improvement

necessary for safety, is held to have assumed the risks involved."

To the same effect are the following cases:    Camp Point Mfg. Co. v. Ballou, 71 Ill. 417; C. & N. W. Ry. Co. v. Donahue, 75 Ib. 106; Sloan v. Graham, 85 Ib. 26; Richardson v. Cooper, 88 Ib. 270.

We think it clear from the facts in the present case, that plaintiff assumed the risk of the condition of the catch-basin, and of walking over it, and therefore can not recover.

The judgment will be reversed.